Marvin Edward BROWN, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 55060.

Court of Criminal Appeals of Texas, Panel No. 3.

Sept. 20, 1978.

On Rehearing Jan. 24, 1979.

Cliff Preslar, El Paso, for appellant.

Steve W. Simmons, Dist. Atty. and Douglas Gelo, Asst. Dist. Atty., El Paso, for the State.

Before DOUGLAS, ROBERTS and DALLY, JJ., and KEITH, Commissioner.

## OPINION

QUENTIN KEITH, Commissioner.

■■■ Appellant was charged by indictment with conspiracy to commit capital murder for the promise of remuneration, and the charging portion of the indictment is set out in the margin.[1] He went to trial jointly with the co-conspirators mentioned in such indictment upon his plea of not guilty. The jury found him to be guilty as charged and the court assessed his punishment at confinement for eighteen years.[2]

During the afternoon of August 18, 1975, Edgar Earl Williams was murdered by one or more persons whom he encountered in his home in El Paso. He was shot by two different pistols and death was caused by the bullet which entered the right temporal region and destroyed a large part of the brain.

While in his garage a few doors from the residence of the deceased on the date of the murder, Michael Ramirez heard "popping" sounds which he took to be an automobile backfiring. He said there were four such shots very close together in point of time but he observed nothing unusual.

A little later on that afternoon Lorna Landry was driving down the street in front of deceased's residence and saw something unusual in the front yard. She turned her vehicle around and went to the scene observing the body of a black male lying in the front yard who had been shot. She had been there only a few minutes when Ruby Williams, widow of the deceased, came up screaming and repeating, "What have they done? What have they done?" In a few minutes the police arrived and she left the scene.

Debra Ducre, a long-time acquaintance of appellant and Christmas, testified that around two or two-thirty in the afternoon of August 18 she and her boy friend Herby were visiting in appellant's apartment. While there, she saw appellant, Christmas, and Anderson talking in the bedroom of the apartment and saw Christmas' automobile outside. Shortly thereafter, the three men and the Christmas vehicle were gone from the apartment.

Jo Jo Pickard told of a conversation a few days before the murder wherein appellant said: "On the way home he said some person, a man—look in the newspaper, a man would be dead, or something like that."

1. ". . . did then and there unlawfully with intent that a felony, to-wit: Capital Murder for the Promise of Remuneration, be committed, agree with Vernon Eugene Anderson and Andre Christmas, to intentionally and knowingly cause the death of an individual, Edgar Earl Williams, for the promise of remuneration; and the said Vernon Eugene Anderson and Andre Christmas performed an overt act in pursuance of said agreement, to-wit: intentionally and knowingly caused the death of an individual, Edgar Earl Williams, by shooting him with a pistol . . . ."

2. During the course of the joint trial, Christmas withdrew his not guilty plea and pleaded guilty to the court, a matter which was not revealed to the jury until it had returned its verdict.

A State witness having repudiated his earlier written statement, the charge against Anderson was dismissed. From the jury arguments, we learn that the grand jury did not return a true bill against Ruby Williams, the widow of the deceased; but from remarks made at the time sentence was imposed, we learn that after conviction and before sentencing appellant appeared before the grand jury and a true bill for some undisclosed offense was returned against Ruby Williams.

Even if we were to assume from our meager record that appellant appeared before the grand jury and admitted his guilt by "cooperating" with the State in its case against Ruby Williams, we do not consider this to be such a judicial confession so as to eliminate the evidentiary questions presented by this appeal under the rationale of *Duggar v. State*, 543 S.W.2d 374, 377 (Tex.Cr.App.1976).

Instead, from our record, his testimony given before the grand jury did not amount to an irrevocable waiver of his privilege against self-incrimination so that the testimony given before the grand jury would be admissible upon another trial. See authorities cited in the opinion on rehearing in *Brumfield v. State*, 445 S.W.2d 732, 737 (Tex.Cr.App.1969).

El Paso police officer Tubbs testified that he had known the deceased for many years and had actually kept the two pistols offered in evidence while the deceased served a tour of duty with the army in Korea.

The State offered two scientific experts from the Federal Bureau of Investigation in Washington who testified as to their examination of certain items of physical evidence, including the pistols, shell fragments, etc. The results of the examinations were inconclusive and their testimony lends little support to the verdict.[3]

Appellant did not testify or offer any evidence in his behalf but now challenges the admission of his confession, claiming that it was the result of an illegal arrest and detention. By four other grounds of error, he contends that the evidence was insufficient to sustain the conviction in that it was insufficient (a) to prove the commission of an overt act by a conspirator; (b) corroborate the statement of the alleged co-conspirator; (c) to corroborate appellant's confession; and (d) to prove all of the allegations in the indictment.

The fifth ground of error, challenging the admission of the confession, will be addressed at the outset. If the confession was improperly admitted, the cause must be reversed as there was, admittedly, insufficient evidence absent the confession to submit the cause to the jury.

Detective Bonilla of the El Paso Police Department began the investigation of the murder on the afternoon of its occurrence. As the investigation proceeded, appellant became a suspect but Bonilla did not feel that he had probable cause for his arrest. On August 27, El Paso police arrested appellant, a soldier stationed at Fort Bliss, for being A.W.O.L. and he was questioned by Bonilla before being turned over to military authorities.[4]

Appellant remained in military custody until shortly before midnight on September 10 the military authorities returned appellant to the custody of the city police where he and the other suspects were questioned separately. From about one until four in the morning, Bonilla and other officers discussed the murder with appellant before he began his confession. He was warned repeatedly by Bonilla of his *Miranda* rights, and the form upon which the confession was typed contained the warnings required by V.T.C.A., Code of Criminal Procedure, Art. 38.22 (1966), and *Miranda*. Several mistakes were made and each was initialed by appellant and each page bore his signature. The confession was completed after nine in the morning, but not until after the completion of the confession was appellant taken before a magistrate.

The trial court conducted an extensive *Jackson v. Denno* type hearing and appellant did not testify then nor did he offer any evidence at such hearing. At the conclusion of the hearing, the trial court filed elaborate findings of fact and conclusions finding that the confession was voluntary and admissible in evidence.

■ Appellant contends that the court erred in admitting the confession because it was the result of "an illegal arrest and illegal detention." We disagree. As stated in *Myre v. State*, 545 S.W.2d 820, 824 (Tex. Cr.App.1977):

> "The fact that appellant was not taken before a magistrate until after he gave his statement does not vitiate a confession that is otherwise properly obtained. Unreasonable delay in bringing an accused before a magistrate only renders the confession inadmissible upon a showing of some causal connection between the delay and the making of the confes-

---

3. State's counsel offered approximately fifty exhibits in evidence including maps, plats, diagrams, photographs, etc., and many pages of our record contained detailed testimony describing such material. None have been sent to this Court. Our views on the subject are to be found in *Cranfil v. State*, 525 S.W.2d 518, 520, fn. 1 (Tex.Cr.App.1975). We repeat our admo-

nition that such material should be made a part of the appellate record.

4. Detective Bonilla admitted on the preliminary hearing on the admissibility of the confession that the first arrest of appellant for being A.W. O.L. was "a subterfuge or mere vehicle . . . used to get [appellant] in to talk to him."

sion. There is no such showing here. *Jurek v. State*, 522 S.W.2d 934 (Tex.Cr. App.1975); *Lester v. State*, 490 S.W.2d 573 (Tex.Cr.App.1973)."

There is no error shown in the admission of the confession and ground five is overruled.

In the abbreviated version of appellant's confession, we reproduce only the highlights. Appellant grew up and went to public school in El Paso where he knew the co-conspirators, Anderson and Christmas. His father's half-sister, Ruby Williams, was married to the deceased and he was well acquainted with the Williams family. About July 21, 1975, Ruby called appellant's home, telling his wife that she needed to talk to appellant but he did not return the call. The next day Ruby called again and appellant talked to her on the telephone. We repeat his version of the conversation.

"When I talked to my aunt, Ruby Williams, on the telephone she told me, 'Junior, I want you to do something for me. It's very important.' I then said, 'Okay.' 'I need somebody to take care of Earl.' I then said, 'What do you mean?' She then said, 'You know what I mean.' I then said, 'Okay, but when,' realizing at this time that she wanted to get my uncle Earl killed. She then said, 'Now. As soon as possible.' I then asked her 'Where is he?' She stated, 'He's at work now,' and at this time told me, 'I mean it,' and then at the time hung up the phone. About two or three days went by, and I did not hear from my aunt Ruby. And Andre Christmas then came to my apartment; and I at this time told Andre if he wanted to make some money, and this would be by killing Earl Williams, as requested by my aunt. And Andre Christmas, who was living with my uncle's daughter, and they have one child, knew who I was talking about. Andre Christmas, then, asked how much he would get out of it, parenthesis, meaning money. I then told him that he would get somewhere between two hundred and fifty dollars and five hundred and fifty dollars—correction, two hundred and fif-

ty dollars and five hundred dollars. As I told him he would get half of what I got, as I was going to be in it with him. Andre Christmas then said, 'Okay, but get some front money.' I told Andre that I would contact my aunt and ask her for some front money, meaning a down payment, in parenthesis. Andre was at this time sitting in the living room. He and I then went to the bedroom and called my aunt Ruby Williams, and that this was sometime around two-thirty p. m., and I called her at home. I then told my aunt that it could be done, parenthesis, meaning that I had somebody that would kill my uncle, Earl Williams, but that it was going to cost her the whole thousand dollars, in parentheses the figures one thousand, and that I needed two hundred and fifty dollars down, two hundred and fifty dollars then. I then told her it would be done if she really wanted to get it done, and she said, 'Okay.' "

A few days later, Ruby Williams sent some money to appellant by her daughter Betty Jean Thomas and it was kept by appellant who, apparently, did not get in touch with Christmas. About a week later, Anderson "came into town" and appellant says, "I at this time told Vernon [Anderson] what my aunt had hired me to do . . . A job, and hired someone to kill her husband. . . . And then if he would go on it with me that I would split the money with him. I did not tell Vernon Anderson . . . that I had already made the same deal with Andre Christmas . . . [or] that my aunt Ruby Williams had already given me part of the money . . . two hundred and fifty dollars, as front money for down payment . . . ."

The confession continued with appellant telling of how Anderson agreed to "kill my uncle for the four thousand dollars." Appellant told of setting up an alibi and named Debbie Ducre as one of his witnesses. He denied participation in the murder but says that the day after the murder Anderson came to his home and continued: "So, it took him to tell me that he had been the one that killed my uncle, Edgar Earl

Williams; and told me to call aunt Ruby so that she would come up with the money. Since that time he has been pestering me to call aunt Ruby as he has not been paid for the job."

■ The statute, V.T.C.A., Penal Code, Sec. 15.02 (1974), defining conspiracy, is set out in the margin [5] and appellant does not challenge the sufficiency of the evidence to show the agreement but apparently contends that the only overt act which will meet the statutory requirements is the act of killing deceased by one or more of the co-conspirators. We disagree. As we said in *Skidmore v. State*, 530 S.W.2d 316, 320 (Tex.Cr.App.1975), "All the elements of a completed offense need not be proven in a conspiracy case."

■ We adopt this argument from the State's brief in answer to this contention of appellant:

"The State proved through the confession of Appellant and other circumstantial evidence that Appellant entered a conspiracy to kill his uncle Edgar Williams. The State also proved that the offense of homicide was committed in that Edgar Williams was shot and killed. The State proved that after agreeing with his aunt to kill his uncle for $1,000.00, the Appellant first recruited Andre Christmas to help him with the killing. He then asked for a down payment, or 'front money', and received $250.00. Thereafter he recruited another co-conspirator, Vernon Anderson, to help him with the killing. One week before the murder, the three co-conspirators went to the home of Ruby Williams and Appellant introduced Vernon Anderson to his aunt and told her 'he could do the job for her.' After the murder, the Appellant collected another $100.00 payment from Ruby Williams. All these acts, the State contends, are overt acts done in pursuance of the agreement to commit a felony. The con-

spirators, at this point, had agreed on the object of the conspiracy. The act of accepting payment to kill an individual and then recruiting killers to help with 'job' must certainly be considered to be overt acts in pursuance to the agreement."

■ Appellant's contention that Anderson's statement that he had killed Williams constitutes hearsay is untenable. The object of the conspiracy had not been completed. Although Williams had been murdered, the conspirators had not received all of their compensation.

In *Robins v. State*, 134 Tex.Cr.R. 617, 117 S.W.2d 82, 84 (1938), this language was used:

"A conspiracy is not finally terminated until everything has been done that was contemplated to be done by the conspirators."

And, as said in *Helms v. State*, 493 S.W.2d 227, 230 (Tex.Cr.App.1973), "Each statement or act of a co-conspirator up until the time the object of the conspiracy is completed is admissible." In *Adamson v. State*, 113 Tex.Cr.R. 335, 21 S.W.2d 675, 677 (1929), the conspiracy was to commit arson by burning down a house so as to collect the proceeds of the insurance policy thereon. The Court held that "the conspiracy had not terminated, since the insurance had not been collected nor had the accomplice been paid"— hence declarations of co-conspirators were admissible. See also *Colunga v. State*, 527 S.W.2d 285, 288 (Tex.Cr.App.1975), quoting from and following *Helms*, supra.

■ Appellant argues that Vernon Anderson's statement that he killed Williams is hearsay and lacks any probative force. We agree that, ordinarily, hearsay lacks probative force. *Ex parte Martinez*, 530 S.W.2d 578, 580 (Tex.Cr.App.1975). But Anderson's statement was admissible under the co-conspirator exception to the hearsay rule. See generally *Mutscher v. State*, 514 S.W.2d 905, 925–926 (Tex.Cr.App.1974), and

---

5. "§ 15.02. Criminal Conspiracy

(a) A person commits criminal conspiracy if, with intent that a felony be committed:

(1) he agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense; and
(2) he or one or more of them performs an overt act in pursuance of the agreement."

*Rodriquez v. State*, 552 S.W.2d 451, 454 (Tex.Cr.App.1977).

In his third ground of error, appellant contends that there was insufficient evidence to corroborate his extrajudicial confession. He points to the fact that in his confession he stopped short of admitting his role in the actual murder of Edgar Williams. From this, he argues that "[i]t is the conspiracy confession which is to be corroborated and Appellant finds no evidence to corroborate the conspiracy." He cites only the statute in support of the contention: V.T.C.A., Code of Criminal Procedure, Art. 38.17 (1966).

Appellant overlooks the fact that neither he nor Anderson was charged with the murder of Edgar Williams; but, instead, both were charged with conspiracy to commit murder for remuneration. He also fails to perceive in his presentation that his confession was offered as an admission against interest; and, it was his own confession which brought before the jury the statement of Anderson of which he now complains.

 The authorities in this state clearly support the rule that when an accused calls a person as a witness and offers the testimony of such witness the testimony so given is not that of an accomplice which must be corroborated under the statute, V.T.C.A., Code of Criminal Procedure, Art. 38.14 (1966). See authorities collated in *Cranfil v. State*, 525 S.W.2d 518, 520 (Tex. Cr.App.1975). In effect, the defendant introduced the damaging testimony from Anderson and we now hold that the so-called accomplice witness rule does not apply to this type of co-conspirator hearsay exception evidence. Cf. *Jenkins v. State*, 484 S.W.2d 900, 902 (Tex.Cr.App.1972).

Finally, relying upon *Seiffert v. State*, 501 S.W.2d 124, 126–127 (Tex.Cr.App.1973), appellant complains that the State failed to prove all of the allegations of the indictment and that, consequently, the trial court erred in overruling his motion for a peremptory instruction. The argument proceeds along this syllogism: "In the case at bar, there is no evidence that either Vernon

Eugene Anderson or Andre Christmas killed Edgar Earl Williams, much less that both of them did so." The indictment gave appellant fair notice of the charge which he was required to meet. *Seiffert*, supra.

Moreover, the State established the corpus delicti under the rule laid down in *Valore v. State*, 545 S.W.2d 477, 479 (Tex.Cr. App.1977); and, as we said in *Self v. State*, 513 S.W.2d 832, 835 (Tex.Cr.App.1974), quoted in *Valore*, supra:

"Proof of the corpus delicti may not be made by an extrajudicial confession alone, but proof of the corpus delicti need not be made independent of an extrajudicial confession. If there is some evidence corroborating the confession, the confession may be used to aid in the establishment of the corpus delicti."

The evidence was sufficient to sustain the conviction when taken with the admissions contained in his confession. See and compare *Barron v. State*, 566 S.W.2d 929 (Tex. Cr.App.1978). None of appellant's challenges to the conviction present merit. The judgment is affirmed.

Opinion approved by the panel.

DOUGLAS, J., not participating.

Before the Court en banc.

## OPINION ON MOTION FOR REHEARING

ODOM, Judge.

Appellant asserts in his motion for rehearing that this Court on original submission incorrectly held that his extrajudicial confession need not be corroborated. We take this as a protest against the finding that the state had established the corpus delicti of the offense charged.

 This Court stated in *Smith v. State*, 363 S.W.2d 277, 279 that:

"It is well settled that a confession, alone, is not sufficient to support a conviction. It must be corroborated. There must be proof that the offense was com-

mitted—that is, the corpus delicti must be proved. The confession may be used to aid in proving the corpus delicti but is not alone sufficient."

For example, the corpus delicti of murder is a death caused by criminal means. A confession supported by such a showing would be sufficient to sustain a conviction for murder and the showing need not be entirely independent on the confession. *Self v. State*, Tex.Cr.App., 513 S.W.2d 832.

 In the instant case, however, the charge was not murder, but conspiracy to murder, and the corpus delicti is different. The conspiracy statute is aimed directly at the increased danger to society presented by criminal combinations. As the practice commentary accompanying V.T. C.A., Penal Code Sec. 15.02 states:

"[C]riminal conspiracy provides a means of striking against the special danger incident to group criminal activity and facilitates prosecution of the group by providing extraordinary evidentiary and procedural advantages."

Section 15.02 holds that a person commits criminal conspiracy when, with felonious intent, he *agrees* with one or more persons to commit an offense and then one of the group does an overt act in pursuance of the agreement. Thus, the corpus delicti of conspiracy must contain a showing of *agreement* to commit a crime. In the instant case, there was no showing at trial beyond the confession itself that there had been an agreement to commit the murder. When there is no corpus delicti, a confession cannot stand. *Smith v. State*, 172 Tex.Cr.R. 407, 361 S.W.2d 390. Had there been some showing of concerted activity directed toward commission of the offense, or had someone come forward to testify as to the existence of the agreement, the confession would have been sufficient to sustain the conviction. Cf. *Denny v. State*, Tex.Cr. App., 558 S.W.2d 467; *Delgado v. State*, Tex.Cr.App., 544 S.W.2d 929; *Helms v. State*, Tex.Cr.App., 493 S.W.2d 227; *White v. State*, Tex.Cr.App., 451 S.W.2d 497. Absent any evidence of the corpus delicti of conspiracy, outside the extrajudicial confession itself, the conspiracy conviction founded on that confession cannot stand.

The motion for rehearing is granted; the judgment of affirmance is set aside; the judgment of conviction is set aside and in view of the insufficiency of the evidence to support a finding of guilt, the judgment is reformed to show an acquittal. *Burks v. U. S.*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), and *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).