**Illeane JACKSON, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 64154.**

Court of Criminal Appeals of Texas, En Banc.

June 22, 1983.

---

George H. Tyson, Jr., Houston, for appellant.

Bill Warren, Dist. Atty., Center, Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION

MILLER, Judge.

An indictment was returned against appellant charging her with knowingly and intentionally causing the death of her daughter, LaTonya Jackson, by striking the child on the head with her elbows. A motion for change of venue was granted and the case was moved from Panola County to Shelby County. The jury returned a guilty verdict and assessed punishment at fifteen years.

The facts are as follow. On October 21, 1977, at 2:00 p.m., appellant brought La-Tonya Jackson, her 8-month old daughter, into the emergency room of Panola General Hospital: LaTonya was pronounced dead on arrival. The child had suffered a fatal subdural hemorrhage on the right side of her brain. Shortly thereafter, appellant's three other children, including LaTonya's twin sister, were removed from appellant's custody by the Department of Human Resources. On November 1, 1977, appellant gave to a Department of Human Resources investigator, a written statement claiming that she had accidently struck the deceased child on the head with her elbows on two occasions. An indictment was returned against appellant in January of 1978 and she was arrested two months later.

The State based its case solely upon appellant's written statement[1] and the testi-

1. The statement was introduced by the State with certain deletions (indicated below in parenthesis). Appellant then read the entire *statement*, without deletions, to the jury. The statement read as follows, with no grammatical correction.

[After a recitation of waiver of rights]

"Two weeks ago when I was in bed sleep I walk up the baby was crying I woke up the baby was crying I had (accident) hit it in the head and it in head and crying I pick it up and hold it and it stop crying I hit it in side of the head with left wlbow the name of baby I hit was LaTonya the next day I knowledge that head was slightly swolen I didn't take

mony of Dr. Franklin Rude, a clinical pathologist, who performed an autopsy on the deceased.

The State called Dr. Franklin Rude to testify in its case in chief. Rude was a clinical pathologist, who had performed over five hundred autopsies, and was employed on a referral basis with the Panola County Sheriff's office.

Rude performed an autopsy on LaTonya Jackson on October 22, 1977. An x-ray examination of the head disclosed a spreading in the suture lines on the child's skull. Rude testified that such spreading was unusual in an infant and was probably caused by increased pressure in the skull. No skull fractures were apparent. Other x-rays indicated that the child had healing fractures in both of her legs. When questioned about these fractures, Rude noted the need for a radiologist for proper interpretation. He could not ascertain the age of the fractures in the child's legs and reiterated the need for a radiologist.

Rude performed an external examination of the child. He found an eighteen pound girl, consistent in weight with an eight month old child. She was cleanly dressed, her diaper was clean, and she had been freshly powdered. Multiple bruises were found on the child's forehead and two bruises were found on the top of the child's head. Rude testified that at the time the examination took place, he commented that the marks would have to be interpreted on the basis on whether the baby was pulling up and trying to learn how to walk, in which case, "not a whole lot could be made of these findings". On further examination, he found two minor healing injuries: a crusted lesion on the bottom of the right nostril and a splitting of the upper lip.

After the external examination, Rude performed an internal examination. He examined the brain on the right side and on the outer surface and found a large, very soft, purple blood clot. On the left side of the brain, he found a dark brown stain over the entire side. This staining indicated a blood loss on that side of the brain at some time. He testified that this was essentially the pertinent information as far as the examination of the brain revealed.

When he was asked about the ultimate cause of the child's death, he stated that the child died due to an accumulation of blood inside the skull resulting in increased pressure. The problem had been compounded by evidence of a loss of oxygen to the area in the past. Between the two losses of blood supply, death resulted.

When questioned about the source of the bleeding found on the right side of the skull, Rude testified that he was unable to identify the source but he believed that it would take a blow of some force to initiate this type of bleeding. With regard to the staining on the left side of the brain, Rude testified that in the past there had been a sizeable bleeding into the skull, which was not fatal, and that the injury had healed.

Rude was questioned concerning the age of the injuries. The lesion on the right nostril was several days older than the bruises on the scalp. He testified that the split on the lip was at least a week or more old. His examination of a section of the blood clot found on the right side of the skull disclosed that part of that clot was just a few hours old, and other parts of the clot had been in contact with the brain

---

LaTonya to the Doctor after I hit it in the head because it wasn't very sincerely. This accured two week befor she died.
[page 2] 4 days before LaTonya die I hit her in the head the second time (accidently by when I was in bed a sleep) she woke up crying and pick up and hold a while still she stop crying and lay her back down she didnt seem like nothing was wrong with and I notice little blood coming from her lips after I hit her it didnt look serious to me so I didnt take her to the Doctor. LaToyna head was swolen on Tuesday after I hit her but I didnt take her to Doctro. LaTonya got her legs caught in the side of the bed and I got her out and I didnt have anything to do with hurting my baby legs.

I have read this statement consisting of 2 pages and I swear or affirms to the truth and accuracy of the facts and information contained therein. This statement is completed at 3:44 P.M. November 1, 1977 /s/ Illene Jackson.

surface for four days or more indicating that the actual blood accumulation in the right side of the skull could have been caused by either an older injury accumulating in effect over 4 or 5 days or both an old and a recent (few hours) injury. He stated that the bleeding on the left side of the skull had probably occurred several weeks prior to death.

When asked whether it would require a blow of some force to produce the bruises found on the forehead, Rude testified that the bruises were fairly typical of those found on children just learning to walk, and on that basis, the interpretation of the bruises would be dependent on the child's history. When asked about the two bruises found on the top of the head, Rude stated that they would be more difficult to explain on the basis of a child learning to walk. He indicated that he would not expect to see such a bruise on a child's skull occasioned by pulling up and falling down.

On re-direct, Rude again testified that the bruises would most easily be explained on a normal activity basis for a young child. Rude further indicated that it was unlikely that all the injuries suffered by the child were sustained in attempting to crawl or walk. He then stated that if it were postulated that a blow from an elbow caused the bleeding in the skull, it would be much more likely that the child was struck and then fell off the bed onto the floor. In this way the bleeding within the skull, would be occasioned by the acceleration injury, (the movement of the brain within the skull). Had the child fallen some thirty inches onto the floor, it would be reasonable to expect bleeding inside the skull. He reiterated that several parts of the brain had suffered loss of oxygen. When asked what caused the brain to be deprived of oxygen, Rude stated "bleeding within the sub-dural space and the blood clot, and that is not ruling out contribution from the previous injury as well".

On cross examination, Rude stated that the deceased was at the age where most infants are learning to walk. He indicated that all of the visible injuries found on the deceased's head could have been explained by the child pulling up and learning to walk, with the resulted falling, and also raising up under and around articles of furniture. He reiterated that he could not identify the place where the bleeding started on the right side of the brain and could not testify as to the nature of the causative force that resulted in the injuries suffered by the deceased. Rude further testified that his examination revealed that the child had been cared for, there was no evidence of diaper rash or malnutrition, and there was evidence that the child had been subjected to regular hygiene and bathing.

On re-cross examination, he was asked whether the injury resulting in death could have been caused by an elbow blow from one who was reclining; he stated that it was unlikely and improbable.

Arguing that the State had failed to establish that appellant had intentionally and knowingly caused the death of the child by a blow to the head with her elbow, appellant made a motion for an instructed verdict of not guilty. The motion was denied and appellant presented her case.

Appellant called Dr. W.C. Smith, a general practitioner, who had seen LaTonya and her sister for medical treatment prior to the child's death. He testified that he had seen LaTonya on October 3, 1977, for a respiratory infection. After her death on October 21, 1977, in the x-ray room, when asked if simply looking at the child revealed to him whether she had been beaten, Smith stated that such a determination was not possible.

Appellant took the stand and testified that she and the twins slept on a single bed which was approximately 30 inches tall and was set in a corner. The twins were usually positioned between appellant and the wall but the babies had fallen off the bed several times. She also stated that on the night of LaTonya's death, Marvin Heard, her boyfriend, was in with the babies and called to appellant to come check on LaTonya who was not moving. After trying unsuccessfully to wake the child, appellant took her to the emergency room where LaTonya was pronounced dead. After several

other witnesses testified, appellant rested and reiterated her motion for instructed verdict, which was again denied.

In her third ground of error, appellant contends that the state failed to prove a corpus delicti: more specifically that the state failed to prove that appellant struck the child and that such blows caused the child's death. The corpus delicti of murder is death caused by criminal means. *Brown v. State,* 576 S.W.2d 36 (Tex.Cr.App. 1979); see also *Smith v. State,* 137 Tex. Cr.R. 634, 132 S.W.2d 264 (Tex.Cr.App. 1939). The state must prove the corpus delicti of the offense, and may do so with the aid of an extra-judicial confession. *Brown,* supra.

A confession standing alone, however, is insufficient to support a conviction. In *Self v. State,* 513 S.W.2d 832 (Tex.Cr. App.1974), wherein the defendant was charged with murder, we affirmed the conviction, and held that:

"Proof of the corpus delicti may not be made by an extrajudicial confession alone, but proof of the corpus delicti need not be made independent of an extrajudicial confession. If there is some evidence corroborating the confession, the confession may be used to aid in the establishment of the corpus delicti."

*Id.,* at 835 and cases cited therein. Therefore, in order for the State to meet its burden of proof, sufficient evidence corroborating the confession must be shown.

Based upon the facts of the instant case, we find that there was sufficient evidence to corroborate the confession and establish that appellant struck the child. Appellant had physical custody of the child when the injuries were inflicted, the child had suffered head injuries, and Rude testified that it was unlikely that all of the injuries suffered were incurred by the child alone. The evidence is sufficient to corroborate appellant's confession that she struck the child with her elbows. *Brown,* supra; *Self,* supra; *Smith,* supra.

A more difficult question is presented when the State's evidence regarding the actual cause of death is examined. The State's evidentiary burden was not discharged by simply proving that appellant struck the child with her elbows. The State had to also prove that the injuries inflicted by appellant actually caused the child's death. When the evidence regarding the cause of death is examined, it is clear that the State failed to meet its burden on this issue in at least two respects.

First, the State did not prove which injury incurred by the child caused her death. Rude was the State's chief witness on this subject. He stated that the injuries suffered by the child were incurred at different times. He also testified that the ultimate death of the child was caused by bleeding within the skull. Rude could not, however, ascertain which injured area within the skull was the source of the bleeding which occasioned the child's death. He indicated that the child had suffered two brain hemorrhages, the first of which was incurred at least a week prior to the second, and that the child's death may have been caused by the combined effect of the two. This evidence does not prove which injury caused the death.

Second, given that the child died from some brain hemorrhage, the State failed to prove that the elbow blows confessed to by appellant caused the hemorrhage which ultimately caused the child's death. The only evidence presented on this issue was given by Dr. Rude. Initially, he testified that some of the child's injuries could be explained as consistent with the injuries incurred by a child just learning to walk. Most important, however, was the doctor's response when asked whether the injury causing death could have been caused by an elbow blow to the head: Dr. Rude stated that it was "unlikely and improbable." Absent a clearer indication that the child's death was caused by a blow or blows delivered from appellant's elbow, the State has presented insufficient evidence to support the conviction. For these reasons, appellant's third ground of error is sustained.

Since we find that there was insufficient evidence to support her conviction, appel-

lant must therefore be acquitted. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).

Since acquittal is required, consideration of appellant's other four grounds of error is unnecessary.

The judgment of the trial court is reversed, and the cause is remanded to the trial court with directions to enter an order of acquittal in accordance with this decision.

McCORMICK and CAMPBELL, JJ., dissent.