**Opinion filed March 28, 2013**



In The

# Eleventh Court of Appeals

_____

## No. 11-11-00201-CR
_____

**SNOW ANN JIMENEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 259th District Court**

**Jones County, Texas**

**Trial Court Cause No. 010581**

## M E M O R A N D U M   O P I N I O N

The jury convicted Snow Ann Jimenez of felony murder of a child, M.C., and assessed her punishment at ninety-nine years. The trial court sentenced Jimenez accordingly. We affirm.

Jimenez presents three issues for our review. In her first issue, Jimenez argues that the trial court abused its discretion when it refused to suppress her October 7, 2010 statements to police. Jimenez asserts in her second issue that the evidence was insufficient to support a conviction of felony murder. In her third issue, Jimenez contends that she suffered egregious

harm when the trial court instructed the jury on felony murder based on the underlying offense of injury to a child.

We will first review Jimenez's third issue in which she argues that the trial court erred when it instructed the jury on felony murder. The court instructed the jury that "[a] person commits the offense of Murder . . . if he commits or attempts to commit a felony and in the course of and in furtherance of the commission or attempt, he commits an act clearly dangerous to human life that causes the death of an individual." This instruction is enumerated in the Texas Penal Code as one of three ways a person commits the offense of murder. *See* TEX. PENAL CODE ANN. § 19.02(b) (West 2011). The application paragraph in the court's charge provided the following:

> Now, if you find from the evidence, beyond a reasonable doubt, that on or about the 4th day of October, 2010, in Jones County, Texas, the Defendant, SNOW ANN JIMENEZ, did then and there, commit or attempt to commit a felony, to-wit: Injury to a Child, by intentionally, knowingly or recklessly causing or attempting to cause bodily injury or serious bodily injury to [M.C.], a child 14 years of age or younger, by throwing or shoving [M.C.] into an armrest of a couch, and in the course of and in furtherance of the commission or attempt, Defendant did intentionally or knowingly commit an act clearly dangerous to human life, to-wit: Defendant did throw or shove [M.C.] into an armrest of a couch, an act which caused the death of an individual, namely, the said [M.C.], then you will find the Defendant guilty of Murder as charged in Count One of the indictment.

Jimenez contends that, under *Garrett v. State*, 573 S.W.2d 543, 545–46 (Tex. Crim. App. [Panel Op.] 1978), the State cannot use the act that caused the death of an individual as the felony that elevates the death to a murder charge. In *Garrett*, the underlying felony offense was aggravated assault with a deadly weapon by threatening a store clerk with a gun, and the act clearly dangerous to human life that caused the clerk's death was pulling a loaded gun from his pocket to scare the clerk. 573 S.W.2d at 545. The court held that this was an improper use of the felony murder rule and held that, in order to prosecute under the felony murder rule, "[t]here must be a showing of felonious criminal conduct other than the assault causing the homicide." *Id.* at 546. In *Johnson*, the court limited *Garrett* by holding that *Garrett* did not create a general merger doctrine in Texas and disavowed the "overly broad statement in *Garrett* that in order to support a conviction under the felony murder provision, '[t]here must be a showing of felonious criminal conduct other than the assault causing the homicide.'" *Johnson v. State*, 4 S.W.3d 254, 258 (Tex. Crim. App. 1999) (alteration in original) (quoting *Garrett*, 573 S.W.2d at 546). The court

2

further held that a felony murder conviction would not lie when the underlying felony was manslaughter or a lesser included offense of manslaughter. *Id.*

Thus, Jimenez argues that when a lesser included offense of murder, such as manslaughter or criminally negligent homicide, is raised, the State cannot seek to convict the defendant under the felony murder rule. However, as the State correctly argues, the trial court did not instruct the jury that manslaughter or criminally negligent homicide was the underlying offense of the felony murder charge but, instead, instructed the jury on manslaughter and criminally negligent homicide as two of five lesser included offenses in the charge. The other lesser included offenses in the charge were recklessly causing serious bodily injury to a child, intentionally or knowingly causing bodily injury to a child, and causing bodily injury to a child by criminal negligence. None of these lesser included offenses were a part of the allegations in Count One of the indictment or a part of the court's charge as to felony murder. Count One alleged that the underlying felony offense was injury to a child, not manslaughter or criminally negligent homicide. In *Johnson*, the Court of Criminal Appeals held that "[t]he offense of injury to a child is not a lesser included offense of manslaughter" and affirmed the Seventh Court of Appeals's holding that the trial court did not err when it instructed the jury on felony murder based on an underlying offense of injury to a child. *Id.* The Court of Criminal Appeals recently reiterated that "[t]he offense of 'injury to a child' can qualify as an underlying felony in a felony murder prosecution." *Contreras v. State*, 312 S.W.3d 566, 584 (Tex. Crim. App. 2010) (quoting *Johnson*, 4 S.W.3d at 258). Therefore, the trial court did not err when it instructed the jury on felony murder based on the underlying offense of injury to a child. We overrule Jimenez's third issue.

In Jimenez's second issue, she argues that the evidence was legally insufficient to support a conviction of felony murder. We review the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we examine all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and any reasonable inferences from it, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

Jimenez was found guilty of felony murder as alleged in Count One of the indictment. Section 19.02(b)(3) of the Texas Penal Code provides, in part, that a person commits felony murder if he "commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, . . . he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." Thus, the State had to prove that (1) Jimenez committed an underlying felony, (2) Jimenez committed an act clearly dangerous to human life, (3) an individual died, (4) the dangerous act that Jimenez committed caused the death of the individual, and (5) Jimenez committed the dangerous act in connection with the underlying felony. *See Contreras*, 312 S.W.3d at 584 (listing elements of felony murder).

The evidence at trial showed that M.C. died on October 4, 2010, due to blunt force trauma to his abdomen. The blow to his abdomen compressed his belly and crushed part of his liver against his spine. His liver ruptured and caused internal bleeding. Because of the blood loss, his body went into shock and he died. M.C. was staying with his father, Ray Gifford, and Gifford's girlfriend, Jimenez, at the time of the injury. M.C. was two years and nine months old.

Jimenez initially told Sergeant Darryl Hart that M.C. had fallen off his toy truck that morning and hit his head. After he hit his head, he grabbed his back and kept saying, "My dad. My dad." He told her that his dad hit him. Jimenez picked him up and laid him in bed. She lay down with him for a while, but then got up to do some things. When she returned, he was not breathing. While paramedics were working on M.C., she called Gifford to find out what he did to M.C., and Gifford responded that he "beat his [butt]." Sergeant Hart arrested Gifford and charged him with assault family violence.

Later that day, Jimenez gave a signed statement to Texas Ranger Michael Parker in which she said that, before Gifford left for work that morning, he took M.C. to the bathroom to use the potty training chair and that she could hear M.C. whimpering. After Gifford left for work, Jimenez asked M.C. to come and get in bed with her. M.C. slowly climbed in bed, and they watched television for about an hour. He was making whining sounds and appeared to be in pain. When she asked him what was wrong, he told her that it was his back. They went outside so he could ride on his toy car, and he fell off the car and scratched his face. Jimenez asked him if he was okay, and he held his back and said, "My back. My back." She raised his shirt up and saw bruises on his lower back. M.C. said they were from his dad. She took him inside, gave

4

him some ibuprofen, and put him back in bed, and he watched television. Jimenez called Gifford to find out what he did to M.C.'s back. He said that he busted him on his upper butt for crossing the road. She checked on him throughout the morning, but when she checked on him around noon, he was not breathing and was unresponsive. She called 9-1-1.

On October 7, the police reinterviewed Jimenez because her story conflicted with the medical examiner's determination of the cause of death and with Gifford's statements to police. During this interview, she signed a second written statement in which she told police that Gifford began calling her bad names that morning and aggravating her until he left for work at approximately 6:30 a.m. After he left for work, she told M.C. to come lie down with her, but he just stood there. Gifford's abuse caused her to snap, and she pushed M.C. into the corner where he hit his face. She told him again to come lie down with her, but he continued to just stand there. Jimenez was frustrated that he would not move, so she got up from the bed, walked over to M.C., grabbed him from behind, and shoved him into the armrest of the couch. M.C. made a sound as if the air had been knocked out of him, and he fell to the floor. Jimenez picked him up, laid him in the bed, and gave him some ibuprofen. She checked on him several times and then took him outside to get some air. M.C. fell down and was not able to get on his toy truck. Jimenez put him on his truck, but he fell off. She took him back inside, gave him some more ibuprofen, and laid him back in bed. She checked on him again around 9:30 a.m., and he was watching television. When she went to check on him shortly before 11:50 a.m., he was unresponsive. She attempted CPR, tried to stand him up so he could get some air, and called 9-1-1.

Jimenez told the detectives that she could show them where in the house she pushed M.C. The detectives took her home, and she showed them the crown molding that she pushed him into. She also demonstrated how she threw M.C. from the bed into the armrest of the couch. Dr. Marc Andrew Krouse, the Chief Deputy Medical Examiner in Fort Worth, testified that being shoved or thrown into an armrest of a couch was the type of injury that could cause the liver to press against the spine and rupture. The time of impact to the time of death was approximately two hours.

Cody Hernandez, a dispatcher for Jones County, testified that she received a 9-1-1 call on October 4 at 11:50 a.m. from Jimenez in which Jimenez said that she had a two-year-old that was having trouble breathing. Jimenez sounded scared, but was not as dramatic as other mothers

5

calling about their child not breathing; "[i]t wasn't the same." Paula Cox, Bob Cox, and Brad Bailey, EMTs for Anson EMS, responded to the 9-1-1 call. When they arrived, Jimenez was standing at the door and told them to "[h]urry." She did not hand the child to them but, instead, "flopped him down on the couch." Paula testified that Jimenez was acting normal and was not upset or excited; she was "[n]ot as concerned as I would have been or any other mother would have been."

Bob could not find a pulse and said, "He's dead." They took M.C. to the ambulance to begin working a code. Paula testified that "[w]orking a code" means that you start CPR, hook the person up to a monitor, intubate, and begin breathing for the person. M.C. was ash gray and cold; had bruises on his face, arms, legs, groin, and back; and had a cut on his head. He had no vital signs.

They transported M.C. to the hospital and, upon arrival, took him to the ER where they assisted ER personnel with the code. Sheila Layne, the Director of Nursing at Anson General Hospital, testified that M.C. had bruising and abrasions over ninety percent of his body. She had no doubt that, when he arrived at the hospital, he was already dead. Hospital personnel suspected abuse and notified police and CPS. Judge Marlon Smith certified M.C.'s death at 12:31 p.m.

Jimenez specifically challenges the sufficiency of the evidence as to whether the State proved her actions caused M.C.'s death. She does not challenge the sufficiency of the evidence as to whether she committed the underlying felony of injury to a child, whether she committed an act clearly dangerous to human life in connection with the underlying felony, or whether M.C. died. Jimenez relies on *Jackson v. State*, 652 S.W.2d 415 (Tex. Crim. App. 1983), to support her argument that the evidence does not establish that her acts caused the child's death. In *Jackson*, the clinical pathologist, who performed the autopsy on the child, testified that it was "unlikely and improbable" that the injury to which Jackson confessed—striking the child with her elbows—was the injury that caused the child's death. 652 S.W.2d at 418. The clinical pathologist further testified that the child had suffered several injuries at different times and that he could not ascertain which injury caused the child's death. *Id.* at 419. The court held that the State failed to prove that Jackson's act of striking the child with her elbows caused the child's death and, thus, that the evidence was insufficient to sustain the conviction. *Id.*

6

Here, Jimenez argues that there was insufficient evidence to show that she caused the death of M.C. by throwing or shoving him into the armrest of a couch because Dr. Krouse could not rule out that an adult karate chop to M.C.'s back was the cause of his death. However, Jimenez mischaracterizes Dr. Krouse's testimony. Dr. Krouse did not testify that he could not rule out an adult karate chop to M.C.'s back as the cause of death. He testified that he believed that the bruises on M.C.'s back were caused by M.C. being hit with an object but that he could not rule out that the bruises were caused by an adult karate chop to his back.

Dr. Krouse never wavered from his finding that the cause of death was blunt force trauma to the abdomen. He explained that the areas where the liver tissue was torn showed that whatever caused the impact had "kind of a rectangular overall shape to it, and [had] enough of an edge to it that the liver was pushed and it was torn just under the capsule by being stretched by this object compressing the liver." Dr. Krouse testified that M.C. being shoved or thrown into an armrest of a couch was the type of injury that could cause the liver to rupture in this way. Because the blow to the abdomen caused M.C.'s death, there was no question that the injury constituted serious bodily injury. He further testified that the injury to M.C.'s back was not serious bodily injury and that, although the injury to M.C.'s back could have contributed to his back pain, it was almost certainly the liver injury that, was causing the perception of pain.

We have reviewed the evidence in the light most favorable to the verdict, and we hold that a rational trier of fact could have found beyond a reasonable doubt that Jimenez's act of shoving or throwing M.C. into the armrest of the couch caused his death. Thus, the evidence is sufficient to sustain Jimenez's conviction of felony murder. We overrule Jimenez's second issue.

In Jimenez's first issue, she argues that the trial court erred when it failed to suppress the statements she made to Chief Barrett Thomas and Ranger Parker at the Anson Police Department and at her home on October 7. Specifically, Jimenez asserts that she was in custody and that she did not voluntarily give her statements because the officers did not give her *Miranda*[1] warnings until after she had already confessed.

Jimenez contends that the following set of circumstances created a situation that was the equivalent of a custodial interrogation: armed officers (1) came to her house and told her that they needed to speak with her; (2) took her to the police station in a police car; (3) did not advise

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

her of her *Miranda* rights until she broke down and began making incriminating statements; (4) assured her that it would go better for her if she would tell the truth; (5) confronted her with the medical examiner's finding that the cause of death was blunt force trauma to the abdomen, not blunt force trauma to the back; (6) confronted her with the fact that Gifford had passed a polygraph exam; and (7) failed to tell her that she was free to leave. She argues that these circumstances would lead a reasonable person to believe that her freedom of movement was restricted and, therefore, that the officers should have given her *Miranda* warnings before she made the incriminating statements. She asserts that, because the officers failed to give her the warnings, she did not voluntarily make the statements and, therefore, that the trial court should have suppressed the statements. In addition, she contends that she was harmed by the trial court's error because the statements that she made on October 7 provided the only evidence that she threw or shoved M.C. into the armrest of the couch.

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). We give great deference to the trial court's findings of historical facts as long as the record supports the findings. *Guzman v. State*, 955 S.W.2d 85, 87 (Tex. Crim. App. 1997). Because the trial court is the exclusive factfinder, the appellate court reviews evidence adduced at the suppression hearing in the light most favorable to the trial court's ruling. *Carmouche*, 10 S.W.3d at 327. We also give deference to the trial court's rulings on mixed questions of law and fact when those rulings turn on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 87. Where such rulings do not turn on an evaluation of credibility and demeanor, we review the trial court's actions de novo. *Id.*

The trial court entered the following pertinent findings of fact and conclusions of law after the suppression hearing: (1) Jimenez was not under arrest, in custody, or detained at the time she made her statements; (2) the statements were not made as a result of custodial interrogation and, thus, are not to be excluded under Article 38.22 of the Texas Code of Criminal Procedure[2]; (3) because there was no custodial interrogation, there was no requirement to give *Miranda* warnings or warnings under Article 38.22; (4) *Miranda* warnings were given during Jimenez's interview on October 7, and Jimenez waived her rights and voluntarily gave her statement; (5) Jimenez was voluntarily present with law enforcement officers when she gave her

---

[2]TEX. CODE CRIM. PROC. ANN. art. 38.22 (West 2005).

statement; (6) Jimenez understood her rights and never invoked them; (7) there was no evidence that Jimenez was intimidated or unduly frightened by the officers; (8) the officers did not threaten, coerce, or promise Jimenez anything in exchange for her statements; (9) at no time did the officers display their weapons or exert any force upon Jimenez; (10) Jimenez gave her statements freely, knowingly, intelligently, and voluntarily; and (11) Jimenez was allowed to leave and was not detained or arrested after she made her statements to the officers.

The record from the suppression hearing supports the trial court's findings. Ranger Parker testified that he and Chief Thomas decided that they needed to talk with Jimenez again because her initial statement to police about how M.C. was injured did not match up with the autopsy findings. They also wanted to talk to her again because Gifford, the initial suspect, passed a polygraph test.

Ranger Parker and Chief Thomas drove to Jimenez's house to ask her to come to the police station so that they could talk to her about what had happened. She did not have transportation to the police station, so she rode with the officers in Chief Thomas's patrol car. Chief Thomas explained to her that she was not in custody and that he and Ranger Parker were merely providing her with a ride. Chief Thomas testified that he believed he told her that he did not have a problem with her coming to the police station later on but that they did need to speak with her. Jimenez was not under arrest and never said that she did not want to go, that she was not going to talk, or that she wanted an attorney. Ranger Parker testified that he thought she was coming to the station voluntarily.

Ranger Parker and Chief Thomas interviewed Jimenez in Chief Thomas's office at the Anson Police Department. Chief Thomas sat behind his desk, Ranger Parker sat in front of the desk in the chair closest to the wall, and Jimenez sat in front of the desk in the chair closest to the door. Chief Thomas believed that he informed Jimenez that the process was voluntary and that she could end the interview at any time. She was not under arrest, detained, or in custody. Both officers testified that, if Jimenez had asked them to, they would have taken her back home at any point and that they would not have prevented her from leaving. The interview was not recorded.

At this point, Ranger Parker and Chief Thomas still considered Jimenez a witness and wanted to ask her follow-up questions regarding the statements she made in her first interview. Chief Thomas testified that, at the time, there was no indication that Jimenez was responsible for M.C.'s death. However, Ranger Parker agreed during cross-examination that their thought

9

process after attending the polygraph exam was, "Well we better go talk to Snow again. We believe she's a suspect."

Ranger Parker and Chief Thomas confronted Jimenez about the autopsy findings and told her that M.C. had internal bleeding due to a blow to the stomach, not the back, and that it was the blow to the stomach that caused M.C.'s death. They also told her that Gifford had passed a polygraph exam. Chief Thomas told her that he did not believe that she told Ranger Parker the truth in her first statement and that he knew that Gifford did not cause M.C.'s death. He also told her that she could be charged with providing a false report to a police officer or could even be charged with murder and that if she had a story to mitigate those charges she should provide it. He told her that it would be better for her to tell the truth instead of them finding out later on that she lied. Chief Thomas testified that he wanted to provide Jimenez an opportunity to explain how Gifford's abuse toward her played a role in the story.

Jimenez eventually broke down, put her head in her hands, and said that she did not mean to do it. Ranger Parker testified that Jimenez's admission of guilt was unexpected. The officers immediately advised her that she had a right to remain silent, that anything she said could be used against her, that she had the right to have an attorney present prior to and during questioning, that she had the right to have an attorney appointed if she could not afford one, and that she had the right to terminate the interview at any time. After waiving these rights, Jimenez made a statement in which she said that she shoved M.C. into the armrest of the couch in her bedroom because he would not listen to her. M.C. made a sound as if the air had been knocked out of him, and he fell to the floor. She picked him up, put him in bed, and gave him ibuprofen. At one point, when she came back to check on him, he was unresponsive. She called 9-1-1. Ranger Parker reduced Jimenez's statement to writing. Jimenez reviewed it and signed it.

Ranger Parker and Chief Thomas testified that they did not coerce, threaten, raise their voices, use undue influence, verbally abuse her, promise her anything, or make her do anything to give or sign the statement. Chief Thomas testified that trying to coerce or threaten her would have been counterproductive because they were trying to get her to trust them so that she would tell the full story of what happened. They did not deny her any basic needs, such as food, cigarettes, or anything else she asked for. Ranger Parker testified that, during the entire interview, Jimenez was upset and crying; however, Chief Thomas did not remember her crying until she broke down, put her head in her hands, and said that she did not mean to do it.

10

Ranger Parker believed that Jimenez changed her initial story because she was confronted with the autopsy findings and the fact that Gifford passed a polygraph exam.

The officers and Jimenez went back to Jimenez's house where Jimenez showed the officers what happened. Jimenez showed them that she was on her knees in the center of the bed and threw M.C. from the bed into the armrest of the couch. Both officers testified that this was different from her statement at the police station in which she said she was standing by the bed and shoved him from behind into the couch. Jimenez consented to the officers entering her house. She never asked to stop the interview, to have an attorney present, or to have an attorney appointed. The officers did not arrest her, but did tell her that she would likely be arrested and charged with some crime in the future.

Both officers testified that they believed Jimenez's statements were voluntarily given. Jimenez did not testify or offer any evidence at the hearing.

A statement made by an accused in a custodial interrogation cannot be used as evidence against her at her trial unless she had been given proper warnings under *Miranda* and Article 38.22 and had knowingly, intelligently, and voluntarily waived the rights contained in the warnings prior to giving the statement. TEX. CODE CRIM. PROC. ANN. art. 38.22 (West 2005). If the statement does not stem from custodial interrogation, the warnings are not required and the statement can be used against the accused at trial. *Id.*

Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. The defendant bears the initial burden of proving that the statement is the product of custodial interrogation. *Gardner v. State*, 306 S.W.3d 274, 294 (Tex. Crim. App. 2009). "[B]eing the 'focus' of an investigation does not necessarily render a person 'in custody' for purposes of receiving *Miranda* warnings or those required under article 38.22 of the Code of Criminal Procedure." *Id.* at 293. There are four general situations that may constitute custody for purposes of *Miranda* and Article 38.22: (1) the accused is physically deprived of her freedom of action in a significant way; (2) a police officer tells the accused she is not free to leave; (3) police officers create a situation that would lead a reasonable person to believe that her freedom of movement has been significantly restricted; and (4) there is probable cause to arrest the accused, and police officers do not tell her that she is free to leave. *Id.* at 294.

11

Jimenez argues that two of these situations apply here. First, she contends that, under the totality of the circumstances, a reasonable person would not have felt free to leave Chief Thomas's office. We disagree. The record shows that Chief Thomas explained to her that she was not in custody and that he and Ranger Parker were merely providing her with a ride to the police station. Chief Thomas believed that he gave her the option to come to the station later and that he told her that it was a voluntary process and that she could end the process at any time. Ranger Parker testified that he believed Jimenez came to the police station voluntarily. Both officers testified that they would not have prevented her from leaving and that, if she had asked to go home, they would have taken her home at any point during the interview. At the end of the interview, the officers ultimately took her home. Under the totality of the circumstances, we cannot say that a reasonable person would not have felt free to leave Chief Thomas's office. *See, e.g.*, *California v. Beheler*, 463 U.S. 1121, 1122–25 (1983) (holding defendant was not in custody when defendant voluntarily came to the police station, was told he was not under arrest, gave statement after brief questioning, and was then allowed to return home); *Oregon v. Mathiason*, 429 U.S. 492, 493–95 (1977) (holding defendant not in custody when defendant voluntarily came to police station at police officer's request, was informed he was not under arrest, was questioned across from officer's desk in office for thirty minutes, and was allowed to leave police station after giving his statement); *Estrada v. State*, 313 S.W.3d 274, 289–95 (Tex. Crim. App. 2010) (holding defendant was not in custody when he voluntarily rode with police to the police station, was told he was not under arrest and was free to leave at any time, was told getting a lawyer was his choice, was told he did not have to speak with police, was questioned for five hours, and was able to return home after giving his statement).

Second, Jimenez argues that the situation arose to one of custody because, even though there was probable cause to arrest, the officers did not tell her that she was free to leave. However, the fact that the officers may not have expressly told her that she was free to leave—after they had probable cause to arrest—does not automatically establish that she was in custody. "[R]ather, custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest." *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996). Here, while the officers may not have continued to tell Jimenez that she was free to leave throughout the interview and after they had probable cause to arrest, the officers told Jimenez at

the beginning of the interview that she was free to leave at any time and clearly communicated to Jimenez at the end of the interview that she was still free to leave by taking her home. Therefore, we cannot conclude that a reasonable person, under these circumstances, would believe that she was under restraint to the degree associated with an arrest.

We hold that the statements Jimenez made to Ranger Parker and Chief Thomas at the police station and when the officers took her home were not the result of custodial interrogation. Because the statements were not the result of custodial interrogation, the officers were not required to give Jimenez *Miranda* or Article 38.22 warnings prior to her making the incriminating statements.

The fact that the officers gave Jimenez *Miranda* warnings after she broke down and said that she did not mean to do it, but before she told the officers the full story, does not change our analysis. Jimenez directs us to *Martinez v. State*, 272 S.W.3d 615, 626–27 (Tex. Crim. App. 2008), for the proposition that her statement was inadmissible because the officers did not take any curative steps between her break down and her full statement to ensure that she clearly understood her rights and that she could decline to give a second statement. However, as the State correctly points out, the "curative steps" rule only applies when an officer deliberately obtains the first statement from an individual in custody without first giving *Miranda* warnings, warns the suspect "midstream," and then, within the same interview, obtains a second statement that essentially provides the officer with the same information as the officer obtained in the unwarned statement. *Martinez*, 272 S.W.3d at 624–27. Here, the officers did not obtain the "I didn't mean to do it" statement in violation of *Miranda* because Jimenez was not in custody; thus, the officers were not required to give her *Miranda* warnings at any point during the interview. *See, e.g.*, *Ervin v. State*, 333 S.W.3d 187, 213 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (holding third statement was properly admitted when appellant was not given *Miranda* warnings prior to making first two statements because she was not in custody and because officers properly gave *Miranda* warnings prior to third statement when she was in custody).

Jimenez also argues that her statements were not made voluntarily because she was not given *Miranda* warnings. Although we have already determined that she was not in custody and, thus, that the officers were not required to give her *Miranda* warnings, we will nevertheless determine whether her statements were "freely and voluntarily made without compulsion or persuasion," as required by TEX. CODE CRIM. PROC. ANN. art. 38.21 (West 2005). *See*

*Oursbourn v. State*, 259 S.W.3d 159, 171–72 (Tex. Crim. App. 2008) (holding individual must voluntarily give statement regardless of whether statement is custodial or noncustodial). Statements can be involuntary when there is police overreaching or police coercion, such as situations in which the suspect was subjected to threats, physical abuse, or extended periods of interrogation without providing for the suspect's basic needs. *Id.* at 169–71. Statements can also be involuntary when the suspect is under duress caused by a source other than police, such as in situations where the suspect is overly medicated, mentally retarded, or intoxicated or has been threatened by a private individual. *Id.* at 172–73.

None of these types of fact scenarios were shown to be present here. Ranger Parker and Chief Thomas testified that they did not coerce, threaten, raise their voices, use undue influence, verbally abuse Jimenez, promise her anything, or make her do anything to give or sign the statement. In addition, there was no evidence that the officers deprived her of any of her basic needs. Furthermore, there was no evidence that she was on any medication, was intoxicated, or had been threatened by any outside source. Under the totality of the circumstances presented, we cannot say that Jimenez gave her statements under compulsion or persuasion. Therefore, the trial court did not err when it refused to suppress the statements Jimenez made to the police on October 7. We overrule Jimenez's first issue.

The judgment of the trial court is affirmed.


JIM R. WRIGHT
CHIEF JUSTICE


March 28, 2013

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Willson, J.