**Affirmed and Memorandum Opinion filed April 30, 2013.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-11-01040-CR

---

**THOMAS LEE SWAN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 263rd District Court**
**Harris County, Texas**
**Trial Court Cause No. 1316314**

---

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Thomas Lee Swan of manslaughter and assessed punishment at 15 years' imprisonment. Appellant challenges his conviction in a single issue contending the evidence is legally insufficient. We affirm.

# I. BACKGROUND

Appellant was living with Jimmy McIntire and the complainant Eric Gross at a house that appellant's mother had set up for homeless men. McIntire explained that there was hostility between appellant and Gross, particularly over food. When the house went into foreclosure, appellant's mother arranged for the men to move into an apartment on April 16, 2008. According to McIntire, that evening appellant began arguing with Gross about food and whether Gross had money on his food stamp card. Appellant then beat up Gross. During the physical altercation, appellant also stabbed Gross in the leg.[1]

Appellant told Gross to change his clothes because Gross was bleeding heavily, and Gross complied. McIntire testified that things calmed down after the fight. McIntire went to the corner store, and when he returned, appellant was still mad at Gross, but McIntire did not think Gross was still bleeding. Later, McIntire overheard appellant making phone calls on Gross's cell phone; McIntire heard appellant refer to a "double." McIntire understood that conversation to mean "that would be a double murder if he killed me too." McIntire also overheard appellant talking with appellant's girlfriend and his mother. Appellant's mother wanted to speak with Gross, but appellant would not let her. McIntire left later that evening or after midnight.[2] Gross was still alive.

---

[1] McIntire testified that he did not know when appellant stabbed Gross. He was the only witness to the stabbing, and he did not own a watch or cell phone (and the electricity was out at the apartment). He testified that Gross had left the apartment earlier in the evening and returned home at about 6:00 p.m. or 6:30 p.m. He also testified that appellant's mother had brought food to the apartment before Gross returned home. Appellant's mother testified that she brought the food to the apartment at 8:30 p.m. or 9:00 p.m.

[2] McIntire testified that he left the apartment at about 11:00 p.m. or 11:30 p.m. However, McIntire also testified that he overheard several phone conversations appellant made using Gross's cell phone. Houston Police Department (HPD) Sergeant John Roberts testified that cell phone records indicated those conversations took place between 12:28 a.m. and 1:04 a.m.

Gross's body was discovered the next morning in a construction site near the apartment complex.[3] His body was lying facedown with a large piece of concrete on top. Several cigarette butts were found at the scene. Sergeant Roberts testified that a cigarette butt lying on the ground near Gross's body appeared "very fresh" because ash was still present and the grass was scorched beneath it. This cigarette butt had appellant's DNA on it. Another cigarette butt contained the DNA of an unidentified female.

Inside a dumpster near the apartment complex, police officers found a bag containing a prescription bottle with Gross's name on it and other toiletries, such as a toothbrush and bottles of shampoo and body wash that not been used completely. Police also recovered a bed sheet and shower curtain with blood on them. Police found other items near the dumpster, such as bloody pants with a tear consistent with the stab wound to Gross's leg.

Appellant went to his mother's house that night. His mother testified that he arrived at about 2:30 a.m. Later that morning, police spoke with McIntire and appellant's mother, among others, while walking through the apartment. Inside, they discovered that the bloodstained carpet had been covered with a rug. Appellant was arrested later that day at his mother's house. Sergeant Roberts testified that the HPD recovered a wallet containing appellant's identification and other items belonging to Gross, which led him to believe it was Gross's wallet taken by appellant. Appellant's mother testified that she found the wallet in the apartment and gave it to the police.

---

[3] HPD Officer Andrew Travella testified that the apartment was about a five- to six-minute drive away from the construction site. HPD Officer Clifton Winston testified that the distance was "maybe quarter of a mile." Sergeant Roberts testified that it was about a four- to five-minute drive with a distance of "a mile, maybe mile or two."

3

Dr. Roger Milton testified that he was the assistant medical examiner who performed Gross's autopsy. He prepared a report that was admitted into evidence at trial. He acknowledged at trial that his report stated, "CAUSE OF DEATH: Blunt trauma of the head with skull and cervical vertebral fractures and stab wound of the right thigh with perforation of the right femoral vein." Milton testified on direct examination that the stab wound could have resulted in Gross's death if left untreated, but the extreme injury to the back of Gross's head did result in Gross's death. He testified that Gross was still alive when his skull was crushed, and that could be determined because there was still blood pressure in the face, scalp, and brain at the time of the blunt trauma. On cross-examination, Milton testified again that the stab wound did not cause Gross's death, and the head injuries did in fact cause the death. The stab wound was treatable, but the head injuries were fatal. Sergeant Roberts attended the autopsy. He testified, "That was a specific question of mine, was he or was he not or can you tell me, at this point alive." Roberts explained that at the time of the autopsy, "there was not an accurate determination made" about whether Gross was still alive when he received the head injury.

Appellant was indicted for murder under six theories: (1) intentionally and knowingly caused death by stabbing with a knife; (2) intending to cause serious bodily injury, caused death by stabbing with a knife; (3) intentionally and knowingly caused death by striking with a piece of concrete; (4) intending to cause serious bodily injury, caused death by striking with a piece of concrete; (5) intentionally and knowingly caused death by striking with an unknown object; and (6) intending to cause serious bodily injury, caused death by striking with an unknown object.

At the charge conference, the State abandoned the indictment paragraphs alleging death by striking with an unknown object. Thus, the court instructed the

4

jury that it should find appellant guilty of murder if it believed that appellant: (1) intentionally or knowingly caused death by stabbing with a knife; (2) intended to cause serious bodily injury, and caused death by stabbing with a knife; (3) intentionally or knowingly caused death by striking with a piece of concrete; or (4) intended to cause serious bodily injury, and caused death by striking with a piece of concrete. The court also instructed that the jury should find appellant guilty of manslaughter if it believed that appellant recklessly caused death by stabbing with a knife.[4] Finally, the charge instructed that the jury should find appellant guilty of aggravated assault if it believed that appellant intentionally or knowingly caused serious bodily injury by stabbing with a knife.

Throughout trial, appellant's counsel conceded that appellant stabbed Gross; counsel asked the jury to convict appellant of aggravated assault. The jury acquitted appellant of murder and convicted him of manslaughter.

## II.   ANALYSIS

Appellant contends the evidence is legally insufficient to convict him of manslaughter because (1) Milton testified that bludgeoning caused Gross's death, and stabbing did not cause Gross's death; and (2) appellant's connection to bludgeoning is too tenuous. Appellant argues that because stabbing "was the only manner and means for the manslaughter instructions, the State was bound to prove that caused the death."

The State contends that the evidence is sufficient to prove that appellant caused death by stabbing in part because the autopsy report listed the stab wound as a cause of death. Alternatively, the State contends that the evidence connecting appellant to the bludgeoning is sufficient. The State argues that appellant

---

[4] The court did not instruct the jury that it should find appellant guilty of manslaughter if it believed that appellant recklessly caused death by striking with a piece of concrete.

5

"incorrectly binds his sufficiency analysis to the jury charge" concerning the cause of death because the hypothetically correct jury charge would not require the State to prove the manner and means of causing death, and "no material variance exists between the indictment, the statute, and the charge."

We hold that the hypothetically correct jury charge for manslaughter would not require the State to prove that appellant caused death by stabbing Gross with a knife. Further, the evidence is legally sufficient that appellant recklessly caused Gross's death by striking him with a piece of concrete.

## A.     Legal Sufficiency Standard of Review

We apply *Jackson v. Virginia*, 443 U.S. 307 (1979), when reviewing the sufficiency of the evidence. *Winfrey v. State*, No. PD-0943-11, — S.W.3d —, 2013 WL 690861, at \*4 (Tex. Crim. App. Feb. 27, 2013). "In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quotations omitted). We "defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony." *Id.* "[I]t is unnecessary for every fact to point directly and independently to the guilt of the accused; it is enough if the finding of guilt is warranted by the cumulative force of all the incriminating evidence." *Id.* (quotations omitted).

## B.     The Hypothetically Correct Jury Charge for Manslaughter: Manner and Means Not Required

In *Malik v. State*, 953 S.W.2d 234 (Tex. Crim. App. 1997), the Court of Criminal Appeals "articulated the modern Texas standard for ascertaining what the

'essential elements of the crime' are; they are 'the elements of the offense as defined by the hypothetically correct jury charge for the case.'" *Johnson v. State*, 364 S.W.3d 292, 294 (Tex. Crim. App. 2012) (quoting *Malik*, 953 S.W.2d at 240).

> The hypothetically correct jury charge is one that at least accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. We have described the law as authorized by the indictment to be the statutory elements of the offense . . . as modified by the charging instrument, but we have said also that the hypothetically correct jury charge does not necessarily have to track exactly all of the charging instrument's allegations.

*Id.* at 294 (footnotes and quotations omitted).

In a number of recent decisions, the Court of Criminal Appeals has addressed what is included in a hypothetically correct jury charge when there is a variance. "A 'variance' occurs whenever there is a discrepancy between the allegations in the indictment and the proof offered at trial." *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011). Although we are not confronted with a variance in this case, we agree with the State that such cases are instructive for determining the hypothetically correct jury charge.[5]

A variance can be immaterial, or it can be material and amount to a failure of proof requiring acquittal for legally insufficient evidence. *See Johnson*, 364 S.W.3d 298–99; *Byrd*, 336 S.W.3d at 247–48. A non-statutory variance that "describes an 'allowable unit of prosecution' element of the offense may or may not render the evidence legally insufficient, depending upon whether the variance

---

[5] The indictment in this case alleged the manner and means for which the State seeks affirmance—striking with concrete. Appellant complains only that that the proof varied from the charge actually given. But one aspect of variance jurisprudence is that the jury charge actually given usually tracks the indictment.

is material." *Johnson*, 364 S.W.3d at 298–99.[6]  "[V]ariances involving immaterial non-statutory allegations do not render the evidence legally insufficient."  *Id.* at 299.  "Little mistakes or variances that do not prejudice a defendant's substantial rights are immaterial."  *Byrd*, 336 S.W.3d at 247–48.[7]  A hypothetically correct jury charge "need not incorporate allegations that give rise to immaterial variances." *Johnson*, 364 S.W.3d at 294.

In *Johnson*, the court found a variance to be immaterial; thus, the evidence was legally sufficient when measured against the hypothetically correct jury charge.  *See id.* at 298–99.  The indictment alleged that the defendant committed aggravated assault causing serious bodily injury by hitting the victim with a hand or twisting her arm with a hand, but the evidence at trial showed that the defendant threw the victim against a wall.  *Id.* at 298.  The court reasoned that aggravated assault is a "'result-of-conduct' crime with the focus or gravamen being the victim and the bodily injury that was inflicted."  *Id.*  The variance was immaterial because "the act that caused injury does not define or help define the allowable unit of prosecution." *Id.*

In reaching this conclusion, *Johnson* gave an example of another immaterial variance by alluding to the offense of murder:

"Stabbing with a knife" and "bludgeoning with a baseball bat" are two

---

[6] For example, in a murder case, the allowable unit of prosecution is the victim—a person may be prosecuted for each person killed.  A material variance would occur if the indictment for murder alleges that the defendant caused the death of Dangerous Dan, but the evidence shows that the defendant caused the death of Little Nell.  *See Johnson*, 364 S.W.3d at 295.  However, an immaterial variance would occur if the indictment alleges that the defendant caused the death of Olen M. Fuller, but the evidence shows that the defendant caused the death of Buddy Fuller and this is the same person.  *Id.*

[7] "On the other hand, a conviction that contains a material variance that fails to give the defendant sufficient notice or would not bar a second prosecution for the same [offense] requires reversal, even when the evidence is otherwise legally sufficient to support the conviction."  *Byrd*, 336 S.W.3d at 248.

possible ways of murdering Dangerous Dan, but they do not constitute separate offenses. These methods of committing murder do describe an element of the offense: the element of causation. But murder is a result-of-conduct crime. What caused the victim's death is not the focus or gravamen of the offense; the focus or gravamen of the offense is that the victim was killed. ***Variances such as this can never be material*** because such a variance can never show an "entirely different offense" than what was alleged.

*Id.* (emphasis added). The court reasoned that "any issue involving a non-statutory variance can be converted into a jury unanimity question." *Id.* at 296. The question is: If both methods of causation had been pled, "could both have been submitted in the jury charge in support of a single offense without violating principles of jury unanimity." *Id.* For a homicide offense, multiple non-statutory manner and means of causation can be submitted without violating unanimity principles. *See id.* at 296–97. Like murder, manslaughter is a "result of conduct" crime. *See Ervin v. State*, 991 S.W.2d 804, 816 (Tex. Crim. App. 1999).

Accordingly, the hypothetically correct jury charge in this case would not require the State to prove the specific manner and means that appellant employed to cause Gross's death. The hypothetically correct jury charge for manslaughter would simply ask whether appellant recklessly caused the death of Eric Gross. We may look to the evidence that appellant struck Gross with a piece of concrete to determine whether appellant caused Gross's death.

## C. The Evidence is Sufficient

The evidence is sufficient that appellant recklessly caused Gross's death by striking with concrete. This evidence includes (1) motive to kill Gross; (2) opportunity to do so; (3) a link to the crime scene by DNA evidence; (4) his incriminating statement about a "double"; (5) taking appellant's wallet; (6) concealing the stabbing incident; and (6) flight from the apartment to his mother's

9

house.

"Although motive and opportunity are not elements of murder and are not sufficient to prove identity, they are circumstances indicative of guilt." *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). Appellant had a motive to kill Gross as the two men had a history of hostility, and appellant had inflicted serious bodily injury to Gross earlier that evening. Further, the evidence supported appellant's opportunity, both temporally and proximally, to commit manslaughter by striking with concrete. This is true even if the jury believed his mother's testimony (which the jury could have disbelieved)[8] that appellant arrived at her house at about 2:30 a.m. The jury could infer from Milton's testimony that Gross was killed sometime that morning before 5:30 a.m.,[9] and appellant stopped using Gross's phone shortly after 1:00 a.m. Appellant's close proximity to the crime scene also tends to establish guilt.[10] *See Wolfe v. State*, 917 S.W.2d 270, 275 (Tex. Crim. App. 1996) (evidence of guilt included that the defendant lived in the same neighborhood and was seen within a few blocks of the crime scene shortly before the homicide); *see also Burks v. State*, 876 S.W.2d 877, 888 (Tex. Crim. App. 1994) (proximity among other evidence satisfied accomplice-witness corroboration).

Further, the presence of appellant's DNA on a "very fresh" cigarette butt found in close proximity to Gross's body would enable a jury to infer appellant's presence at the scene of the homicide when Gross was killed. *See King v. State*, 29

---

[8] *See Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006) (jury may disbelieve uncontradicted testimony from the defendant's mother because "[s]he is, after all, the defendant's mother").

[9] The body was discovered at about 8:30 a.m. in "full rigor"; Milton testified that it would take three to six hours from the time of death to reach full rigor.

[10] Officer Winston testified Gross's body was found "maybe a quarter mile" away from the apartment.

S.W.3d 556, 565 (Tex. Crim. App. 2000) (finding sufficient evidence of murder as a party, relying on "DNA evidence from a cigarette butt at the crime scene— indicating appellant's presence during the murder"). Appellant's incriminating statement about a "double" made in McIntire's presence suggests that appellant caused Gross's death and considered killing McIntire. *See Guevara v. State*, 152 S.W.3d 45, 51 (Tex. Crim. App. 2004) (finding sufficient evidence of murder as a party; noting the defendant's incriminating statement to a friend that he was researching how to make a silencer). Appellant's taking of Gross's wallet and adding his identification card is another circumstance of guilt the jury could consider. *See Padilla v. State*, 326 S.W.3d 195, 200–01 (Tex. Crim. App. 2010) (finding sufficient evidence of murder when the defendant possessed "fruits of the crime" such as the victim's money and jewelry shortly after the murder). Given that appellant was still present at the apartment when McIntire left, the jury could have inferred that appellant attempted to conceal incriminating evidence by covering the bloodstained carpet with another rug and throwing out Gross's personal items and the bloodstained pants, towel, and shower curtain. *See Guevara*, 152 S.W.3d at 50 (circumstance of guilt includes "[a]ttempts to conceal incriminating evidence"). Finally, appellant's middle-of-the-night departure from the apartment to his mother's house suggests intent to escape or flee from detection or apprehension for his conduct. *See Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) ("[A] factfinder may draw an inference of guilt from the circumstance of flight.").

Considering the totality of the evidence in the light most favorable to the jury's verdict, with reasonable inferences therefrom, a rational fact finder could have found beyond a reasonable doubt that appellant caused Gross's death.

Appellant's authorities do not command a different result. First, the Court of Criminal Appeals decided *Jackson v. State*, 652 S.W.2d 415 (Tex. Crim. App. 1983), at a time when the sufficiency of the evidence was measured against the charge actually given. *See Malik*, 953 S.W.2d at 235, 239–40. Thus, when the State failed to establish that the alleged manner and means—striking the child on the head with her elbows—actually caused the death of the child, the court was required to acquit. *See Jackson*, 652 S.W.2d at 416, 419–20 (the State's pathologist testified that although the child suffered two brain hemorrhages that caused death, it was "unlikely and improbable" that the two elbow blows confessed to by the defendant caused death). Although the jury charge here listed stabbing as the only manner and means for manslaughter, and Dr. Milton testified that stabbing did not cause death, the hypothetically correct jury charge now authorizes a conviction based on any manner and means supported by the evidence.[11]

Finally, *Louis v. State*, PD-0323-11, — S.W.3d —, 2012 WL 2007632 (Tex. Crim. App. June 6, 2012), concerned the sufficiency of the evidence to prove knowledge or intent when the defendant's conduct—hitting a child with a leather belt—was a concurrent cause of the child's death, but there was no evidence that the defendant knew that another person would later repeatedly strike the child's head and hang him by his arms in a closet. *Id.* at *5. Because of "the absence of any evidence showing that the child could or would have died from the injuries caused by appellant alone—the jury could not have reasonably inferred that appellant intended to cause the death of the child." *Id.* However, Dr. Milton testified that the stab wound "could" have caused death if left untreated, and

---

[11] For a similar reason, we find the Corpus Christi Court's opinion in *Walker v. State*, 701 S.W.2d 2, 3 (Tex. App.—Corpus Christi 1985, pet. ref'd), lacking precedential value; also, the court specifically relied upon the now-defunct reasonable hypothesis construct. *See Geesa v. State*, 820 S.W.2d 154, 158, 161 (Tex. Crim. App. 1991).

12

striking with concrete did in fact cause death. Appellant does not attempt to challenge the element of recklessness on appeal, but regardless, Dr. Milton's testimony would satisfy this element. *Louis* is inapplicable.

We hold that the evidence is legally sufficient. Appellant's sole issue is overruled.[12]

## III. CONCLUSION

Having overruled appellant's sole issue, we affirm the trial court's judgment.

/s/     Sharon McCally
         Justice

Panel consists of Justices Boyce, McCally, and Mirabal.[13]

Do Not Publish — TEX. R. APP. P. 47.2(b).

---

[12] Appellant does not address, and we will not consider sua sponte on original submission, what impact, if any, our holding has on appellant's right to due process. *See Wooley v. State*, 273 S.W.3d 260, 271 (Tex. Crim. App. 2008) (holding that "appellant's due-process rights were violated when the court of appeals affirmed his conviction under the unsubmitted theory that he aided 'another' to murder the complainant"; the jury charge actually given authorized conviction as a party by aiding a named individual, but the hypothetically correct jury charge would not require the person to be named in the charge); *see also Adames v. State*, 353 S.W.3d 854, 859–61 (Tex. Crim. App. 2011) (similar error required reversal of the conviction and remand for a new trial even though the evidence was legally sufficient under the hypothetically correct jury charge). *See generally McCormick v. United States*, 500 U.S. 257, 270 n.8 (1991) ("This Court has never held that the right to a jury trial is satisfied when an appellate court retries a case on appeal under different instructions and on a different theory than was ever presented to the jury. Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury.").

[13] Senior Justice Margaret Garner Mirabal sitting by assignment.

13