**Affirmed and Memorandum Opinion filed July 6, 2023**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-21-00364-CR

_____

**RITA YOUNG, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 239th District Court
Brazoria County, Texas
Trial Court Cause No. 89547-CR**

## MEMORANDUM OPINION

Rita Young appeals her conviction for capital murder, contending there was insufficient evidence to support her conviction, and the trial court abused its discretion in limiting certain testimony of a psychologist. For the reasons set forth below, we affirm.

### Background

On the night of January 22, 2017, several neighbors reported seeing two

individuals kick in Don Weido's door and hearing gun shots. John Moore, who lived across the street, testified that he saw a suspicious sedan backed into Weido's driveway and saw two figures moving toward the front of the house. Believing that a robbery was about to take place, he instructed his wife to call 911 and exited the side of his home to check on Weido. Samuel Louis, who lived a few doors down, testified that he heard four gunshots in a row. When he exited his house to investigate, he observed a gray Ford Taurus backed into Weido's driveway and witnessed two white males bolt out of Weido's front door. He observed the Ford Taurus driving past his home. Louis and Moore approached Weido's house. They noticed that the front door was open and called out to Weido multiple times, but they did not receive a response. Neither neighbor entered Weido's home.

Responding to 911 calls from neighbors, officers with the Pearland Police Department were dispatched to Weido's house. Sergeant Adam Carroll, the patrol sergeant on night shift, testified that when he arrived at Weido's house, the door was already open and other officers were present. He observed that the "door frame was actually splintered indicating that it was violently forced open and there was a bullet hole in a little trim piece of a window." Carroll also testified that the bolt latch from the door frame was on the floor. Inside the breakfast nook, Weido was found dead from multiple gunshot wounds. Medical attention was not necessary because Weido was clearly deceased. Dr. Erin Barnhart, chief medical examiner for Galveston County, performed Weido's autopsy. She testified to eight gunshot wounds involving the head, neck, torso, and left upper extremity. There was a total of four projectiles recovered, and the cause of death was confirmed as multiple gunshot wounds.

Detective Jon Albin, a criminal investigator with the Pearland Police Department, assisted with the homicide investigation. When Albin arrived at

Weido's house, he documented the scene with a video camera and photographs. Albin indicated that the damage to the hardware on the door frame was consistent with forced entry. He also located a handgun left underneath Weido's body. The handgun was later identified as a Hi-Point 9-millimeter.

During the course of the investigation, investigators learned that the Shadow Creek Ranch Homeowner's Association had cameras installed at eleven intersections. On January 21 and 22, the cameras captured a silver sedan, license plate number HZG4042, entering and exiting the Shadow Creek development. Registration records indicated that Jarrett Wyatt Angst was the owner of the sedan captured in the surveillance video footage. This same vehicle, a 2007 silver Ford Taurus, was later found at Angst's place of employment. Investigators obtained and executed a search warrant to search the sedan. Albin performed the search of the vehicle and recovered a receipt from Academy Sports & Outdoors dated January 19, 2017. This receipt showed that Angst purchased CCI 9-millimeter ammunition. This debit card purchase was verified by PIN and recorded by surveillance video footage from above the cash register. Albin also recovered a work shirt embroidered with the name "Jarret," a Family Dollar bag containing a pair of pants and a long sleeve shirt saturated in blood, and a pair of black gloves with white lettering.

The day after the offense, Officer Eric Morton with the Pearland Police Department responded to an address to follow up on the Hi-Point 9-millimeter handgun found underneath Weido's body. In the course of his investigation, Morton located Stephen Heiman. Morton testified that Heiman's shoes caught his attention because "[t]here was a dark colored substance on the portion of his shoe" that Morton suspected to be blood. After Heiman agreed to be interviewed at the Pearland Police Department, a black pair of tennis shoes belonging to him was collected. Heiman also consented to a forensic download of his phone and a buccal swab.

3

Detectives John Despain and Chris Simons worked an alternate angle of the investigation and confronted Angst at his job with pictures from the Association's surveillance. Angst voluntarily agreed to be interviewed at the Pearland Police Department. During the interview, Angst consented to a forensic download of his cellular telephone, a buccal swab, and search of his house. A search warrant was obtained to search Angst's home. Detectives recovered a bag containing a red t-shirt, black shorts, black and white Nike shoes worn by Angst the night of the offense, and a Taurus 9-millimeter semiautomatic handgun. It was later discovered that shell casings recovered at the scene matched the Hi-Point 9-millimeter weapon recovered from under Weido's body and the Taurus 9-millimeter handgun recovered from Angst's home.

Under questioning, Angst and Heiman implicated each other, Brandy Meyer Eckles, and appellant. Eckles is appellant's biological daughter. Eckles was previously married to Weido, and they had one child together, C.W. Eckles also had another child from a prior relationship, Ashley Zeck. Zeck was appellant's granddaughter and Heiman's former girlfriend in high school. Heiman provided law enforcement with information about a child custody dispute between Eckles and Weido and an alleged sexual assault involving Zeck. Investigators interviewed Angst and Heiman for several hours at a time on multiple different occasions in an attempt to clear up the contradictory information provided. Based on these interviews, investigators decided to talk to Eckles and appellant. Investigators also secured a search warrant for Eckles' cellphone to be forensically downloaded.

Upon completing Eckles' second interview, Detective Cecil Arnold located appellant at Houston Methodist Sugar Land where she was hospitalized. Arnold conducted one interview with appellant on January 25, 2017, and another interview the following day. Both interviews were recorded, and Arnold testified to large

4

inconsistencies between the two interviews.

During the first interview, appellant stated that her caretaker, Jackie Smith, read in a newspaper article that [Angst] and [Heiman] were arrested in connection with Weido's murder. It was later discovered that no such article or story existed. Appellant stated that on the night of Weido's murder, Heiman and his "heavy set" brother came to her house around 9:00 p.m. looking for work. She asked Heiman to bring her to the hospital because she was having trouble breathing. Throughout the initial interview, appellant disclosed to Arnold that she did not like Weido because "he manipulated the courts . . . and molested her granddaughter." According to appellant, Zeck allegedly revealed while under hypnosis that she was sexually assaulted. However, there was no other evidence supporting appellant's allegations. Appellant also told Arnold that she confided in Heiman about her upcoming court battles regarding C.W. and the alleged sexual assault against Zeck. Investigators informed appellant that a search warrant had already been obtained for her cellphone. Subsequently, appellant admitted that she deleted a message from Eckles containing Weido's home address. She alleged that she wanted to send C.W. a Christmas card and needed Weido's address.

During the second interview, appellant was confronted with inconsistencies between the prior interview and information provided to law enforcement by Angst and Heiman. She acknowledged that she "hir[ed] them to go kill him." Afterwards, appellant backpedaled from her statement and claimed that she did not hire either one of them to do it and planned on doing it herself. To support her claims, appellant attempted to retrieve a handgun from her purse that she intended to use to shoot Weido. Later in the interview, appellant changed her story and explained that she only intended for Angst and Heiman to scare Weido. She "did not ask [Heiman] to do anything but scare [Weido]." She told Heiman that "[t]here [were] two guns on

5

top of [her] refrigerator . . . take those . . . and pistol whip that son of a bitch."

Heiman testified at appellant's trial, but Angst did not. Heiman confirmed that he dated Zeck in high school. According to Heiman, appellant discussed Weido's alleged sexual assault on Zeck and the contentious custody battle with him and Angst the week before the incident. He stated that appellant provided Heiman with two guns, Weido's address, and a timeframe in which to kill Weido. Heiman asserted that the night he and Angst drove appellant to the hospital, he told her that "everything was taken care of." Heiman also stated that appellant did not explicitly guarantee him anything for murdering Weido but later mentioned a joke where he told appellant about "how much [he] had worked off the land."

On January 27, 2017, appellant was arrested for her role in connection with Weido's murder. The State charged appellant by indictment with capital murder, alleging that she intentionally caused the death of Weido while burglarizing or attempting to burglarize a habitation, or alternatively, through remuneration or the promise of remuneration. A jury found appellant guilty of capital murder as charged in the indictment. The State did not seek the death penalty, and the trial court sentenced appellant to life in prison without parole.

### *Discussion*

In two issues, appellant challenges her capital murder conviction. We first turn to appellant's legal sufficiency challenge. In her first issue, appellant contends that there is insufficient evidence that she committed the capital murder for which she was convicted. *See Campbell v. State*, 125 S.W.3d 1, 4 n.1 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (reviewing court will first address issues that, if sustained, require reversal and rendition of judgment, before turning to issues seeking remand). Specifically, appellant contends that the State did not present legally sufficient evidence that she acted as a party or principal in the course of committing or

6

attempting to commit burglary of a habitation nor did the State establish the element of remuneration or the promise of remuneration.

## I. Sufficiency of Evidence

We apply a legal sufficiency standard of review in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). Under this standard, we examine all the evidence adduced at trial in the light most favorable to the verdict to determine whether a jury was rationally justified in finding guilt beyond a reasonable doubt. *Temple*, 390 S.W.3d at 360; *Criff v. State*, 438 S.W.3d 134, 136–37 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd). This standard applies to both direct and circumstantial evidence. *Criff*, 438 S.W.3d at 137. We do not sit as a thirteenth juror and may not substitute our judgment for that of the factfinder by reevaluating the weight and credibility of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Rather, we defer to the factfinder to fairly resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from basic to ultimate facts. *Id.* Each fact need not point directly and independently to the appellant's guilt as long as the cumulative effect of all incriminating facts is sufficient to support the conviction. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Accordingly, we will uphold the jury's verdict unless a rational factfinder must have had a reasonable doubt as to any essential element. *Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009); *West v. State*, 406 S.W.3d 748, 756 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

A person commits the offense of murder if she intentionally or knowingly causes the death of another person. Tex. Penal Code § 19.02(b)(1). A person commits the offense of capital murder if she intentionally commits murder under

7

Texas Penal Code section 19.02(b)(1) while in the course of committing or attempting to commit burglary. *See id.* at § 19.03(a). A person commits the offense of burglary if she, "without the effective consent of the owner," "enters a building or habitation and commits or attempts to commit a felony, theft, or an assault." *Id.* at § 30.02(a)(3).

Relevant to this case, a person is criminally responsible as a party to an offense if the offense is committed by [her] own act, by the conduct of another for which [s]he is criminally responsible, or both. *Id.* § 7.01(a). Each party to an offense may be charged with commission of the offense. *Id.* § 7.01(b). Each party to an offense "may be charged and convicted *without alleging* that [s]he acted as a principal or accomplice." *Id.* at § 7.01(c) (emphasis added). A person may be held criminally responsible for an offense committed by the conduct of another if:

> (1) [A]cting with the kind of culpability required for the offense, [s]he causes or aids an innocent or nonresponsible person to engage in conduct prohibited by the definition of the offense; (2) acting with intent to promote or assist the commission of the offense, [s]he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; (3) having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, [s]he fails to make a reasonable effort to prevent commission of the offense; or (4) if, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

*Id.* at § 7.02(a)(1)–(3), (b).

### A. Murder While Committing Burglary

Appellant contends that the State did not prove beyond a reasonable doubt that she acted as a party or principal in entering Weido's house to commit the offense

of burglary. Appellant further alleges that there was no evidence of theft or burglary.

"In a prosecution for capital murder based on burglary, the requirement that a felony be intended is satisfied by the murder of the victim." *Gardner v. State*, 306 S.W.3d 274, 287 (Tex. Crim. App. 2009). Although no eyewitness testified in court to seeing appellant shoot Weido, the State may prove the defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence. *Id.* at 285 (citing *Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986)).

Here, police officers interviewed appellant on two separate occasions for several hours. Initially, she denied involvement in the murder and was adamant that she needed Weido alive for an ongoing custody dispute. Ultimately, she admitted to hiring Angst and Heiman to murder Weido. Though appellant did recant this confession, she later acknowledged that she provided Angst and Heiman with two guns to use to "pistol whip" Weido as a message from her. It is undisputed that neither Angst nor Heiman had any independent connection to Weido. The trial court admitted evidence that appellant provided them with Weido's photograph, home address, two firearms (one of which was found underneath Weido's deceased body), and a timeframe to commit the murder before C.W. returned home. Armed with the firearms and information provided by appellant, Angst and Heiman went to Weido's house, began shooting Weido through the glass window from outside of the house, kicked in the front door to gain entry, and continued shooting Weido once inside. Neighbors reported hearing gun shots and seeing two male individuals fleeing Weido's house; surveillance cameras in Weido's subdivision captured Angst's vehicle entering and exiting Weido's subdivision; the Taurus 9-millimeter semiautomatic handgun discovered at Angst's house and the Hi-Point 9-millimeter handgun linked to appellant's deceased husband matched shell casings recovered at

9

the scene; Weido's blood was discovered on Heiman's shoes; Angst and Heiman went to appellant's home after the murder; and Heiman told appellant that "everything was taken care of."

Considering all of the evidence in the light most favorable to the verdict, the jury rationally could have found beyond a reasonable doubt that appellant was criminally responsible as a party to capital murder and that she solicited, encouraged, directed, or aided Angst and Heiman in the commission of the offense.

### B. Murder for Remuneration

Appellant also asserts that a jury could not have rationally concluded that the State met its burden of proving the element of remuneration beyond a reasonable doubt.

The due process clause of the Fourteenth Amendment requires that every state criminal conviction be supported by evidence that a rational factfinder could accept as sufficient to prove all the elements of the offense beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 364 (1970). Under the Fourteenth Amendment, therefore, our task is to consider all the record evidence, direct and circumstantial, in the light most favorable to the jury's verdict, and to determine whether, based on that evidence, any rational jury could have found all the elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. "If, based on all the evidence, a reasonably minded jury must necessarily entertain a reasonable doubt of the defendant's guilt, due process requires that we reverse and order a judgment of acquittal." *Narvaiz v. State*, 840 S.W.2d 415, 423 (Tex. Crim. App. 1992).

In addition to the due process guarantee, the common law corpus delicti rule holds that no criminal conviction can be based upon a defendant's extrajudicial confession unless the confession is corroborated by independent evidence tending to

10

establish the corpus delicti. *Fisher v. State*, 851 S.W.2d 298, 302 (Tex. Crim. App. 1993) (citing *Gribble v. State*, 808 S.W.2d 65, 70–71 (Tex. Crim. App. 1990) (plurality opinion), cert. denied, 501 U.S. 1232 (1991)); *Brown v. State*, 576 S.W.2d 36, 42–43 (Tex. Crim. App. 1978). The rule does not require that the independent evidence fully prove the corpus delicti, only that it tend to prove the corpus delicti. *Fisher*, 851 S.W.3d at 302 (citing *Self v. State*, 513 S.W.2d 832, 835–837 (Tex. Crim. App. 1974); *Wood v. State*, 152 S.W.2d 335, 339 (Tex. Crim. App. 1941)).

A person commits the offense of capital murder if she intentionally commits murder under Texas Penal Code section 19.02(b)(1) for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration. Tex. Penal Code § 19.03(a)(3). Though "remuneration" is not defined in the penal code, the Texas Court of Criminal Appeals has made clear that remuneration "encompasses a broad range of situations, including compensation for loss or suffering and the idea of a reward given or received because of some act." *See Beets v. State*, 767 S.W.2d 711, 734 (Tex. Crim. App. 1987) (op. on reh'g); *see also Rice v. State*, 805 S.W.2d 432, 435 (Tex. Crim. App. 1991) ("While the definition of remuneration is broad, the actor must expect to gain from some benefit *assessed on the death of the victim*.") (emphasis in original).

In *Beets*, the court of criminal appeals concluded that section 19.03(a)(3) is inclusive of situations where "an individual commits a murder (1) for remuneration or (2) the promise of remuneration or (3) employs another to commit the murder for remuneration or (4) employs another to commit the murder for the promise of remuneration." 767 S.W.2d at 736. Regardless of which manner is alleged, the State carries the heavy burden of demonstrating that the murder was performed for the reason of some sort of pecuniary gain. *Rice*, 805 S.W.2d at 435 ("The State is obligated to offer some evidence of the defendant's intent or state of mind as related

11

to an expectation of [tangible] remuneration.").

The indictment that was handed down charged appellant with employing Angst and Heiman to murder Weido for remuneration or the promise of remuneration, namely money and/or real property. Prior to trial, when Arnold confronted appellant with her prior statements that were inconsistent with evidence law enforcement learned throughout the course of the investigation, appellant made a series of extrajudicial statements that she "hired [Angst and Heiman] to go kill [Weido]." When asked if she was telling the truth, she repeated the same and added "[Eckles] is a good mother, and I planned on killing him [myself]." Later in the interview, appellant asserted that she disclosed to Heiman all the problems Weido caused her family—namely Eckles, Zeck, and C.W. On January 18, 2017, appellant acknowledged that she offered Heiman $100 to go to Weido's house and "beat the shit out of the son of a bitch and tell him it's from me." She claimed that she did not know Heiman intended to bring Angst along.

Heiman testified in the State's case in chief and corroborated portions of appellant's confession that tended to establish the element of murder for remuneration. *See Fisher*, 815 S.W.2d at 302. Initially, Heiman asserted that he was not promised money or real property in exchange for murdering Weido. Heiman testified that he felt "manipulated" by appellant because he disclosed to appellant that he was the victim of sexual assault, and afterwards, appellant divulged that she wanted Weido murdered because of allegations that Weido sexually assaulted Zeck, Heiman's former girlfriend, as well as for problems Eckles was having with custody and child support. In subsequent testimony, Heiman acknowledged that in exchange for murdering Weido, he hoped "to work off the land [appellant] was living on." In a conversation with appellant on the way to the hospital after Weido's murder, appellant told Heiman that "she wish[ed] she had been there and was able to pull the

12

trigger herself," and Heiman responded with "quips about how much [he] had worked off the land."

While there is disputed testimony about what whether Angst and Heiman were promised money or land, it is undisputed that appellant provided Angst and Heiman with Weido's address and told them Weido needed to die before C.W. returned to Weido's house. Heiman testified that neither he nor Angst knew Weido, and but for appellant's solicitations, encouragement, direction, or aid, they would not have gone to Weido's house and killed him. *See Rice*, 805 S.W.2d at 434 (holding that murder for remuneration is not limited to murders for hire).

Viewing the evidence in the light most favorable to the verdict and presuming the jury properly weighed the credibility of each witnesses' testimony, resolving any conflicts in favor of the State, we conclude that the jury had sufficient evidence from which to conclude beyond a reasonable doubt that appellant intentionally and knowingly solicited, encouraged, directed, aided, or attempted to aid Angst and Heiman in the commission of Weido's murder for remuneration. *See Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Accordingly, appellant's first issue is overruled.

## II.    Limiting Testimony

In appellant's second issue, she argues that the trial court abused its discretion in limiting the testimony of Dr. Jolie Brams, a court-appointed licensed clinical psychologist, and excluding a number of slides in a PowerPoint presentation related to Brams' testimony.

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim.

13

App. 2009); *Foyt v. State*, 602 S.W.3d 23, 47 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd). If the trial court's ruling falls within the zone of reasonable disagreement, we will affirm that decision. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003); *Foyt*, 602 S.W.3d at 47. When evaluating harm from non-constitutional error flowing from the exclusion of relevant evidence, we examine the record as a whole, and if we are fairly assured that the error did not influence the jury or had but a slight effect, we conclude that the error was harmless. *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). "Rule 44.2(b) provides that errors in criminal cases which do not affect substantial rights are to be disregarded on appeal." *Id.* (citing Tex. R. App. P. 44.2(b)).

### A. Brams' Testimony

The trial court appointed Brams to assist appellant's trial counsel in assessing appellant's sanity at the time of Weido's murder. Prior to trial counsel's opening statement, and pursuant to Rule of Evidence 705, the State challenged the underlying facts or data Brams relied upon in formulating her opinion that appellant "did not understand her actions were wrong at the time the alleged offense was perpetuated." *See* Tex. R. Evid. 705. Outside the presence of the jury, trial counsel questioned Brams about the underlying facts and data that contributed to her opinion. The State objected to Brams' proposed testimony contending that (1) there was no evidence of severe mental defect or illness, and (2) there was no evidence as to why appellant did not understand the objective reasons why her actions were wrong. Ultimately, the trial court overruled the State's objection:

> THE COURT: So, the ruling at this point in time is that the State's objection is overruled. The only thing that I'm going to - - to set some parameters on is that everybody stay within the motion in limine even as it relates to [Brams'] testimony as it related to the specific instances that occurred between Ms. Eckles and Mr. Weido. As far as the underlying date, she can testify she reviewed certain things in reaching

her opinion.

[STATE]: And I didn't catch the last part. I apologize. With - - are you allowing or not allowing?

THE COURT: I'm going to allow her to testify as to what she used to reach her opinion.

[STATE]: Okay.

THE COURT: As to the specifics of that, you know, as far as the tests, I mean, I think it - - those tests she's talking about, the IQ and the educational tests, she can say she reviewed those in reaching her opinion. That probably goes more to diminished capacity than it does to insanity. But she can say she reviewed those things along with the medical records. What I'm not going to allow her to go into is any specific instances of conduct or anything that happened between Ms. Eckles and Mr. Weido other - - other than in general like I did with Ashley.

Assuming that appellant preserved this issue for appeal, appellant merely made the conclusory statement that the trial court denied her "the ability to fully present her defense." However, Brams testified that she reviewed over 6,000 pages of medical records and all of the law enforcement investigation, including several hours of police interviews and pictures of the condition of appellant's house; testified about a serious automobile accident in 1999 that resulted in appellant's brain impairment; opined in great detail about appellant's general IQ being extremely deficient; and proffered her opinion that appellant was "so neurologically compromised" as to not have the ability to have the appropriate perceptions, planning, judgment, control of her impulses, understanding of consequences, or an understanding that her behavior was criminally wrong.

We find appellant's argument that the trial court abused its discretion in limiting Brams' testimony to be unpersuasive. Brams conceded that appellant's alleged intellectual deficiencies did not prevent appellant from lying to law enforcement during the investigation or telling investigators that she should be

15

arrested for murder—evidence that appellant understood that her behavior was criminally wrong.

In this case, we are fairly assured that that any error flowing from the limitations placed on Brams' testimony were harmless. *See Morales*, 178 S.W.3d at 867. Appellant was permitted to present her insanity defense, and there is no indication in the record before us that appellant's substantial rights were violated. *See id.* ("[E]rrors in criminal cases which do not affect substantial rights are to be disregarded on appeal.").

### B. PowerPoint Presentation

Prior to calling Brams for direct examination, trial counsel presented the trial court with an eighteen-page printout of a PowerPoint presentation that was to be shown to the jury during Brams' testimony. The State objected to any use of any instrumentation or testing that was prepared by another expert in conjunction with Brams' testimony. The jury was excused, and the trial court reviewed each page of the PowerPoint and placed an "X" on the pages that were to be removed from the presentation and not shown to the jury. Trial counsel conducted a voir dire examination of Brams outside the presence of the jury, and Brams provided testimony regarding the relevance of the redacted portions of the PowerPoint presentation. At the conclusion of the voir dire examination, the following occurred:

> [DEFENSE]: I had one more thing I want to add to the record is it's just the - - that the Court's rulings on Dr. Brams' testimony and the - - the PowerPoint is - - is preventing the - - the defense from - - it's preventing us from putting on a complete defense in a capital setting.
>
> THE COURT: Noted.

We disagree with the State's argument that appellant's trial counsel did not obtain an express ruling on the objection because the trial court's ruling may be express or implied. *See* Tex. R. App. 33.1(a). Assuming that the trial court implicitly

16

ruled on trial counsel's objection with "noted," counsel need not make an offer of proof given that the substance of counsel's objection was apparent from the context. Tex. R. Evid. 103(a)(2); *see also* Tex. R. App. P. 33.1(a)(2)(A) (acknowledging a trial court's ruling may be either express or implied).

Nonetheless, we are not convinced that the trial court's redaction of the PowerPoint prevented appellant from putting on a complete defense. As noted above, the PowerPoint presentation was for demonstrative purposes only. Moreover, reviewing the record as a whole, both Brams and Michael Fuller, a forensic psychiatrist who testified to neuropsychiatric conditions in appellant's medical records, provided extensive testimony in support of appellant's insanity defense. Accordingly, appellant's second issue is overruled.

### *Conclusion*

We affirm the judgment of the trial court.

/s/    Frances Bourliot
Justice

Panel consists of Justices Jewell, Bourliot, and Zimmerer.

Do Not Publish — TEX. R. APP. P. 47.2(b).

17